IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOE DISHNER, Individually and as Executor of The ESTATE OF RUTH ANNE MARDOCK, EMMA DISHNER and GEORGE DISHNER, | §<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | Civil Action No:   3:17-cv-3321 |
| vs. | §<br>§ | |
| UNIVERSAL HEALTH SERVICES, INC., | §<br>§ | |
| Defendant. | §<br>§ | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

COME NOW Joe Dishner, Individually and as Executor of the Estate of Ruth Anne MarDock, Deceased, Emma Dishner, and George Dishner (collectively, "Plaintiffs") complaining of Universal Health Services, Inc. (hereinafter referred to as "UHS" or "Defendant") and would respectfully show unto the Honorable Court the following:

### I.
### DISCOVERY CONTROL PLAN

1.      Pursuant to Rule 26 of the Federal Rules of Civil Procedure, a discovery plan will be established following the conference between the parties.

### II.
### PARTIES

2.      Plaintiff Joe Dishner is an individual residing in this District and is the spouse of Ruth Anne MarDock, deceased.

3.      Plaintiff Emma Dishner is an individual residing in Texas and is the biological child of Ruth Anne MarDock, deceased.

4.      Plaintiff George Dishner is an individual residing Texas and is the biological child of Ruth Anne MarDock, deceased.

5.      Defendant Universal Health Services, Inc. is a Delaware corporation with its principal place of business located in King of Prussia, Pennsylvania.  Defendant is registered to do and is doing business in the State of Texas and may be served with Summons and a copy of this Complaint by serving its registered agent in Texas: Corporation Services Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

6.      Defendant owns and manages behavioral health facilities across the United States, including the following facilities in this District: The Pavilion at Northwest Texas HS, Red River Recovery Center, The Excel Centers in Arlington, Lewisville, and Fort Worth, and Timberlawn Mental Health System.

### III.
### JURISDICTION AND VENUE

7.      Venue is proper in this District pursuant to 28 U.S.C.A. § 1391(b)(1),(2) because the incident made the basis of this lawsuit occurred in this District and as such, a substantial part of the events giving rise to this claim occurred in this District.

8.      This Court has subject matter diversity jurisdiction over this action pursuant to 28 U.S.C.A. § 1332 because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This Court has personal jurisdiction over Defendant because it is registered to do business and actually does business in Texas, and has thus subjected itself to personal jurisdiction in Texas.

**IV.**
**GENERAL STATEMENT OF FACTS**

9.      Plaintiffs' claims arise out of an incident that occurred on June 30, 2016, at its

Timberlawn facility, which is owned and controlled by Defendant UHS.

10.      As a direct result of UHS's systematic and endemic inadequacies regarding

staffing, security, and oversight of its Timberlawn facility, Dr. Ruth Anne MarDock was killed

by a UHS patient.

<u>UHS Generally</u>

11.      UHS operates as a publicly-traded, for-profit company, and its stock is traded on

the New York Stock Exchange.  UHS is the fourth largest publicly traded hospital company by

revenue with over $9.7 billion in annual revenue in 2016.  UHS operates 24 acute care hospitals,

5 ambulatory surgical centers and 198 behavioral health facilities in the United States, Puerto

Rico and the U.S. Virgin Islands.

12.      UHS's behavioral health segment comprises about half of the company's total

annual revenue, but because it is so much more profitable, this business segment generates the

vast majority of UHS' profits.

13.      UHS is reliant on government funding, as more than half of UHS's revenue

comes from federal and state government programs funded by taxpayers. UHS has reported that

55% of its behavioral segment's net revenue came from Medicare and Medicaid programs, an

estimated total of $2.2 billion.

14.      While reaping the benefits of government funding, UHS at the same time cites

lower government scrutiny of its operations as a favorable quality of operating in the behavioral

health sector.

15.      UHS's CFO has said that, "[T]he good news about that is it tends to get, I don't

want to say no attention, but a fairly minimal amount of attention from payers, which I think is generally a good thing."

16.     While UHS reaps the benefits of taxpayer money, it does not use those funds to adequately staff, manage, supervise, or ensure the safety of its facilities.  Instead, UHS has systematically reduced the amount of money it spends on staffing and supervision in order to increase profits at the expense of employee and patient safety.

17.     Adequate staffing, management, supervision, and safety for the number and acuity of patients is essential in the behavioral health setting, and providing a safe environment to meet patients' and staff needs is an essential requirement for all hospitals.  Psychiatric staffing, safety, and supervision levels must take into account patients' risk of violence and suicide as well as their medical needs, which tend to be higher than the general population.  Research suggests that higher levels of staffing, safety, and supervision lead to better patient outcomes and safe environments.

18.     UHS's high profits are directly tied to cuts in its staffing, management, safety, and security costs.

19.     Salaries, wages and benefits are typically the largest costs in the behavioral health industry.  In 2014, UHS cut staffing costs in its behavioral division to their lowest level in the last decade, with just 48.6% of revenue going to staff salaries, wages and benefits.

20.     Analysis of financial data also shows that UHS spent less of its revenue on salaries, wages and benefits than its rival company Psychiatric Solutions, Inc. ("PSI"), which UHS purchased in 2010.

21.     After UHS acquired PSI and integrated those facilities into its business, the proportion of revenue spent on salaries, wages and benefits at UHS behavioral health facilities

was just over fifty percent.  In 2014, this percent fell even lower.

22.     This trend is consistent with a statement made by UHS's CFO Steve Filton to investors related to how UHS planned to expand margins at its acquired PSI facilities:

> Well, the bottom line, I think, is when you look at the behavioral business model and you look at our financial statements, you will see that at least 50% of our expenses are salary and wages and salary related, and probably the next biggest functional expense line is maybe 5% of expenses. So when you really talk about the management of expenses and behavioral, one, one-A, one-B, and one-C are all salary and related expenses. So for sure, when you talk about a gap in our margins, a good chunk of that has to come from a more efficient use of people, headcount, people in the right positions, etc., and frankly, that's a big part of our focus going into it.

23.     In 2013 UHS said of the PSI facilities, "When we bought them . . .  their operating margins were slightly below UHS's. . . . I think they are now, after two years operating really at par."  UHS had previously indicated that it would increase the PSI facilities' profitability not by increasing revenue but by cutting costs, saying the increase in profits "will come from more efficient management of the operating expenses than from anything that actually happens on the top line."

24.     In short, UHS cuts staffing, safety, supervision, and management expenses to the detriment of the safety of those on its premises.

<u>UHS Has Experienced Systemic Issues As A Result Of It Putting Profits Ahead Of Safety</u>

25.     Numerous inspection reports and lawsuits citing problems related to inadequate staffing, safety, supervision, and management has been reported at UHS facilities.

26.     In Arizona, state regulators found that the number of nursing staff in Valley Hospital's Psychiatric Intensive Care Unit and Rapid Stabilization Unit did not match the

number required by the facility's FTE (full-time equivalent) calculator for at least 3 days in April 2013 and 2 days in May 2013.

27.    In California, a former mental health tech at Sierra Vista Hospital alleges she was terminated because Sierra Vista Hospital chose not to accommodate her workplace injury and because she made complaints about the health and safety conditions at the hospital.  Specifically, she alleges that she was fired in retaliation for complaining about staff threatening patients, unsanitary and unsafe patient environments (e.g., dirty restrooms resulting in several Methicillin-resistant Staphylococcus aureus ("MRSA") outbreaks), and concerns over sexual assaults on patients by staff.  She also claims the facility had insufficient staffing and, on occasion, had only one staff member to care for 20 patients.

28.    In Florida, Manatee Palms Youth Services was cited twice by state regulators in 2013 for failing to meet the required number of staff for adequate supervision. In one case, a patient engaged in self-harming behavior while she was supposed to be under close observation. When the Florida Agency for Health Care Administration interviewed a mental health technician at the facility, it was revealed that "her assignments often result in her being responsible for patients in rooms not close to each other which made completing the 15 minute checks difficult."

29.    In Georgia, the state Healthcare Facility Regulation Division cited Lighthouse Care Center of Augusta for violations related to staffing, hospital governance, discharge records, and emergency restraint procedures. Surveyors found that contrary to the rule, a registered nurse had not been present on more than 25% of night shifts within a three month period.

30.    In Illinois, Riveredge Hospital was found by the state health department to have inadequate staffing levels. Facility policy required an additional nurse to be added to a unit when

patient census reached 17. However, review of staff schedules showed multiple instances where the facility did not provide the additional nurse.

31.     In Nevada, the Bureau of Health Care Quality and Compliance cited Spring Mountain Treatment Center for failing to follow its staffing plan. State surveyors found that the facility repeatedly understaffed its shifts. For example, on the night of 10/20/10, of the 68 patients present, three required line of sight monitoring and one needed one-on-one observation. The facility was staffed with only three registered nurses that night, despite the large patient census and staffing grid requirements that called for four registered nurses when the census was between 67-71 patients. On 10/21, there were 67 patients, eight of which needed line of sight monitoring, but again only three nurses and seven techs were assigned. On 7/20 and 7/21, there were 73 patients and 69 patients, respectively, but only 3 registered nurses were assigned.

32.     In North Carolina, Old Vineyard Behavioral Health was cited by the Centers for Medicare and Medicaid Services ("CMS") because the facility failed to provide each unit with a separately functioning staff.  Review of staffing assignment sheets and interviews revealed that instead of providing one licensed nurse for each unit, one nurse sometimes covered duties on two units at once, switching places with a mental health technician ("MHT") when she moved between them.

33.     In Texas, the CMS cited Laurel Ridge Treatment Center in two related inspections for failing to ensure that the number and qualifications of doctors of medicine and osteopathy was adequate to provide essential psychiatric services. The facility was cited for failing to ensure a physician was available to perform a one hour, face-to-face evaluation of a secluded patient. CMS' interview with the facility Nursing Director revealed that an evaluation was not performed because there was no physician physically present in the facility after 11:00

p.m., since the facility utilized telemedicine for facility admissions past this hour. She added that "it was up to the attending physician whether they wanted to come in to do a face-to-face assessment."

34.    In Florida, Manatee Palms Group Homes was cited by the Florida Agency for Health Care Administration for failing to protect the rights of children by not having sufficient and appropriate staff to supervise patients, resulting in patient exposure "to potential abuse and harm." Three adolescent/teen patients ran away from the facility, even though two of these patients were ordered to be under close observation and had histories of running away. One patient reported that while she was away from the facility she received money for having sexual relations with two adult males. As a result of the sexual misconduct allegations, Child Protective Services was called and the Sheriff's Office conducted an investigation.

35.    In North Carolina, Old Vineyard Behavioral Health was cited by the Division of Health Service Regulation for failures to protect clients by failing to monitor them during a disruptive incident. Video evidence showed one resident knocking out ceiling tiles and tearing metal support beams from the ceiling in the hallway. A separate camera captured two residents in their bedroom engaging in 15 sexual acts over the course of one hour and 15 minutes. One of the residents, a 14-year-old, reported the sexual contact to staff and said that his 17-year old roommate forced him to do it. While observation sheets for these residents documented periodic observations, video showed that staff never entered the room to monitor them. Further investigation revealed that because of the incident in the hallway, one staff member was responsible for observing eight residents at the time, instead of the usual four residents. When interviewed, the lead mental health counselor on the shift said, "eight patients is too much for

effective monitoring. [...] I should have called for additional staff for proper milieu management."

36.    In Texas, inspectors from CMS determined that River Crest Hospital failed to "maintain an adequate number of registered nurses, licensed practical nurses and mental health workers to provide the nursing care necessary under each patient's active treatment program." CMS found that one evening shift had only one registered nurse, one Licensed Vocational Nurse ("LVN") and one MHT to supervise 14 child and adolescent patients, four of whom were on line of sight monitoring precautions. Based on the facility's staffing grid, there should have been one more MHT on this shift. In the middle of this understaffed shift, a patient eloped from the facility by jumping over the fence. When he was returned by law enforcement, facility staff apparently failed to search him for contraband. Five minutes after returning, the patient placed a staff member "in a choke hold and held a rusty fork to her neck."

37.    At Valley Hospital in Arizona, over the course of two days, six RN's were ordered to lower their professional assessment of patient acuity from level "4" to "3." Interviews with other employees revealed that nurses were unable to complete daily 15 minute rounds and medicating duties, and had to make patients wait 24-72 hours for supervised shave and laundry. State surveyors assessed these problems as issues related to Valley Hospital's failure to properly implement the acuity plan, which informs hospital staffing levels based on the needs of individual patients.

38.    In Florida, the Agency for Health Care Administration found that Emerald Coast Behavioral Hospital failed to staff the behavioral intensive care unit with adequate numbers of personnel to provide care to patients as needed. The unit includes patients who are low functioning and actively suicidal, aggressive, or unable to maintain themselves and likely to act

out; records showed only 2-3 staff on the unit for 14 patients.  Staff was observed spending most of their time providing assistance to patients and taking only a few breaks to complete paperwork, but "[e]ven with staff diligence, the numbers were inadequate to meet the needs of patients." The records describe several failures in patient care, including a patient who was observed to be unsteady on her feet, needing staff assistance to walk. On one morning, she needed help to change out of urine soaked pants. The patient was observed to be in bed during that afternoon, and staff "stated that the nurse wanted her to stay in bed because she was so unsteady on her feet." On another day this patient was observed "wearing a paper shirt and pants that were way too large for her," causing her to expose herself intermittently. The unit's one mental health technician had to leave the unit to search for clothes that would fit her.

39.    In January 2013, National Deaf Academy was cited by Florida's Agency for Health Care Administration after a patient escaped from the facility through the front door. The patient had previously tried to run into traffic and escape precautions were ordered. The facility's written policies noted that security personnel shall be "vigilant in their observation of the client behaviors" when these precautions were ordered, but staff confirmed that the facility had eliminated its security personnel some time ago.

40.    At The Vines Hospital in Florida, dust, debris, dead insects and food particles were found in patient bedrooms and public spaces. The Lead Housekeeper indicated "there is not enough staff," and the Lead Mental Health Technician said techs sometimes have to clean rooms. The Plan of Correction indicated a change in housekeeping staffing hours.

41.    At Old Vineyard Behavioral Health in North Carolina, one Registered Nurse ("RN") was made responsible for simultaneously monitoring four patients on two different units, all with histories of being sexual offenders with aggressive behaviors, while also dispensing

medications. When interviewed, the nurse said, "I was watching (all 4 of the residents - 3 on Phoenix 12 and 1 on Phoenix 9) from the med(ication) room. I was watching the dayroom the best I could." Despite her efforts, a 13-year-old male patient later reportedly performed oral sex on another patient in the dayroom, saying "I was afraid he was going to clobber me."  In a separate incident four years later, Old Vineyard was found by the Centers for Medicare and Medicaid Services to have failed to ensure the protection of patients' right to be free from abuse. One nurse said that she was not able to protect a patient because, "I am rarely able to leave our glass bubble (nursing station). We have 18 patients with one nurse. (RN #2) stayed over but she said she wasn't helping with the new admissions until her day shift charting was done. I had four admissions."

42.     At a facility in California, a pharmacist alleges that the CEO required her to perform monitoring rounds and conduct group counseling sessions with psychiatric patients even though she was not trained as a hospital manager or mental health professional. She alleges that when she wrote a group email to other employees suggesting an update for the facility's Hazardous Substances Policy, the CEO wrote back, "You need to stop the emails NOW around this issue." She alleges that she then injured her knee and was not allowed to return to work despite having a doctor's note clearing her for work with minor accommodations.

43.     In Florida, two Staff Therapists allege in a lawsuit that after raising compliance and safety issues at their facility, "Gilrain was terminated from NDA only hours after he sent an email to the UHS Corporate Compliance Officer and human resources department detailing and objecting to incidents of unlawful conduct. Similarly, Plaintiff Savage was terminated approximately two weeks after she submitted a written complaint objecting to incidents of unlawful conduct at NDA to UHS President Alan Miller."

UHS' Inadequate Staffing and Other Failures At Its Timberlawn Facility

44.     UHS owns, manages, and controls Timberlawn Behavioral Health System in Dallas ("it's Timberlawn Facility.")

45.     The problems that have plagued UHS at other facilities have persisted at its Timberlawn Facility.

46.     In 2013, its Timberlawn Facility was fined $165,000 for supervisory breakdowns that led to patient violence.

47.     In December 2014, a patient hanged herself on a doorknob that Timberlawn knew was dangerous but did nothing to remedy.

48.     In February 2015, federal investigators began a series of inspections at its Timberlawn Facility and threatened to cut off federal funding if it did not come into compliance with patient safety, staffing, and other guidelines.

49.     In March 2015, a ten year-old girl patient was assaulted by other patients.  During the assault, the unit reportedly had just one mental health technician for 14 girls.  All required 15-minute checks, and seven of them were monitored as assault risks.  A worker reportedly told inspectors that staffing levels were "unsafe" that day.  Another acknowledged that the hospital "did not have enough staff."  The incident, reportedly, was not investigated.  In addition, while the 10-year-old girl was at the general hospital, the staff continued to record her as sleeping in the unit or interacting with other patients.

50.     In April 2015, a thirteen year-old patient fractured his wrist but was not sent to the hospital for treatment.

51.     In May 2015, Dallas police went to its Timberlawn Facility after a female patient alleged that a male patient had forced her to touch his genitals and raped her. The male patient

reportedly told inspectors that the two "had intercourse" and that it was "very easy" to go between patient rooms unnoticed by the staff. On the night of the incident, the unit had too many patients. CMS said in records that the overcrowding had "compromised the provision of care that meets the patients' psychomedical and psychosocial needs."

52.     Later in 2015, Medicare regulators stripped Timberlawn of federal funding and the State of Texas fined Timberlawn a record $1 million dollars and ordered it to surrender its license.

53.     On June 30, 2016, while Timberlawn was still fighting the $1 million fine, Dr. Ruth Anne MarDock was killed by a patient.

54.     In October 2017, a thirteen year-old girl was raped by another patient at Timberlawn.

<u>UHS' Inadequate Staffing, Safety, Supervision, and Management At Its Timberlawn Facility Caused the Death of Ruth Anne MarDock</u>

55.     Dr. Ruth Anne MarDock was a physician who worked as an independent contractor at UHS' Timberlawn Behavioral Health System, which is owned, managed, and controlled by UHS.

56.     Around 1:00 p.m. on June 30, 2016, Dr. MarDock was killed when a patient tackled her to the floor, hitting her head so hard that she ultimately died from the injury.

57.     Plaintiff Ruth Anne MarDock, deceased, was an invitee on a premises controlled by Defendant UHS.

## V.
## WRONGFUL DEATH CLAIMS

58.     Joe Dishner brings his individual claims by and for the benefit of all parties entitled to bring such claims pursuant to the Wrongful Death Act, Texas Civil Practice and

Remedies Code 71.001, et seq.

59.     Joe Dishner was the legal spouse of Ruth Anne MarDock at the time of the incident and has been appointed as the Executor of her Estate.

60.     Emma Dishner and George Dishner are the biological children of Ruth Anne MarDock and are statutory wrongful death beneficiaries. Tex. Civ. Prac. & Rem. Code § 71.004.

## VI.
## CAUSES OF ACTION

### A.     PREMISES LIABILITY

61.     Plaintiffs repeat and re-allege all foregoing allegations into this cause of action.

62.     Ruth Anne MarDock was an invitee on a premises controlled by Defendant UHS and as such, Defendant UHS owed Ruth Anne MarDock a duty of ordinary care to keep the premises in a reasonably safe condition.

63.     At the time, Defendant UHS was a possessor of the premises.

64.     A condition on the premises posed an unreasonable risk of harm.

65.     Alternatively, Defendant UHS created a dangerous condition on the premises.

66.     Defendant UHS knew or reasonably should have known of the danger.

67.     Defendant UHS breached its duty of ordinary care by either (1) failing to adequately warn Ruth Anne MarDock of the condition, or (2) failing to make the condition reasonably safe.

68.     Defendant UHS's breach was a proximate cause of the injuries to and death of Ruth Anne MarDock.

### B.     NEGLIGENCE

69.     Plaintiffs repeat and re-allege all foregoing allegations into this cause of action.

70.     Defendant UHS owed Ruth Anne MarDock a duty to provide her with a safe work

environment, including one that had reasonable staffing, safety, supervision, and management.

71.     Defendant breached its duty to Ruth Anne MarDock by failing to provide a safe work environment.

72.     Defendant's breach was a proximate and but-for cause of damages, including the injuries to and death of Ruth Anne MarDock.

## VII.
## GROSS NEGLIGENCE

73.     The acts and/or omissions of the Defendant, when viewed objectively from the standpoint of the Defendant at the time of the occurrence, involved an extreme risk considering the probability, magnitude and potential harm to others, of which Defendant had actual, subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of the public, including Ruth Anne MarDock.

74.     This grossly negligent conduct was a proximate cause of the injuries and/or damages to Ruth Anne MarDock.

75.     The conduct of Defendant caused severe and incapacitating injuries and death to Ruth Anne MarDock. With respect to the nature of its conduct or circumstances surrounding its conduct, Defendant was aware of the nature of its conduct or that the circumstances existed. Alternatively, Defendant was aware that its conduct was reasonably certain to cause serious bodily injury or death to a member of the general public, including Ruth Anne MarDock.

## VIII.
## DAMAGES

76.     As a direct and proximate result of the acts and/or omissions of the Defendant, as set forth herein above, Plaintiffs are, individually as survival and wrongful death beneficiaries, entitled to recover the following elements of damage:

- past and future loss of advice that they would have received from Ruth Anne MarDock;

- past and future loss of counsel that they would have received from Ruth Anne MarDock;

- loss of reasonable contributions of a pecuniary nature that they would have received from Ruth Anne MarDock, including lost earning capacity, advice, counsel, services, care, maintenance, and support;

- loss of inheritance;

- past and future loss of companionship and society of Ruth Anne MarDock;

- past and future mental anguish related to the loss of Ruth Anne MarDock; and

- Ruth Anne MarDock's pain and mental anguish, medical expenses, and funeral expenses.

## IX.
## EXEMPLARY DAMAGES

77.     The acts and/or omissions of Defendant as set out above constitute an entire want of care so as to indicate that the acts and/or omissions in question were the result of conscious indifference to the rights, welfare, and safety of Ruth Anne MarDock, or that they constitute gross negligence, as that term is defined by law, so as to give rise to an award of exemplary damages.

78.     The Court should assess exemplary damages against Defendant in an amount that will punish Defendants and deter others from engaging in similar grossly negligent conduct.

## X.
## INTEREST

79.     Plaintiffs seek recovery for pre-judgment and post-judgment interest at the highest legal rate allowed by law.

## XI.
## RELIEF SOUGHT AND PRAYER

80.     Plaintiffs requests that Defendant be cited to appear and answer, and that this case be tried, after which Plaintiffs recover:

a.  Judgment against Defendant for a sum within the jurisdictional limits of this Court for the damages indicated above;

b.  Pre-judgment and post-judgment interest at the maximum amount allowed by law on all elements of applicable damages claimed herein;

c.  Costs of suit;

d.  Such other and further relief, both general and specific, at law or in equity, to which Plaintiffs are entitled.


Dated: December 7, 2017                   Respectfully submitted,

                                          */s/ R. Dean Gresham*_____
                                          **STECKLER GRESHAM COCHRAN PLLC**
                                          R. Dean Gresham
                                          Texas Bar No. 24027215
                                          dean@stecklerlaw.com
                                          Stuart L. Cochran
                                          Texas Bar No. 24027936
                                          stuart@stecklerlaw.com
                                          L. Kirstine Rogers
                                          Texas Bar No. 24033009
                                          krogers@stecklerlaw.com
                                          12720 Hillcrest Road, Suite 1045
                                          Dallas, TX 75230
                                          Telephone: 972-387-4040
                                          Facsimile: 972-387-4041

                                          **ATTORNEYS FOR PLAINTIFFS**

---